**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION**

**ALLSTATE INSURANCE COMPANY**                                        **PLAINTIFF**

**VERSUS**                                        **CIVIL ACTION NO. 2:10cv47KS-MTP**

**ARTHUR B. GREEN**                                                    **DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

This matter is before the court on a Motion for Summary Judgment **[#11]** filed on behalf of the plaintiff, Allstate Insurance Company ("Allstate").  The court, having reviewed the motion, the response, the briefs of counsel, the pleadings and exhibits on file and being otherwise fully advised in the premises finds that the motion is well taken and should be granted. The court specifically finds as follows:

**FACTUAL BACKGROUND**

On February 15, 2007, Arthur Bernard Green purchased a house from Joy Champ, located on 201 Clarence Ray Drive in Hattiesburg, Mississippi, for $89,100.00. The house was located in an area adjacent to Mixon Creek that for years experienced periodic episodes of serious flooding.  To combat the destructive effects of what had become a consistent and widespread problem for the entire community, the Lamar County Board of Supervisors created a "Multi-Jurisdictional Hazard Mitigation Plan" in an attempt to reduce the extent and frequency of the flooding episodes, and to provide

protection for the people and property within the area.

The house purchased by Green, which is at the center of this litigation, itself was affected by the persistent flooding. After Green purchased the house, the Mississippi Emergency Management Agency ("MEMA") conducted an assessment on the property in relation to its own Lamar County Mixon's Creek Acquisition Project. According to the MEMA report, the house had flooded on at least four previous occasions, occurring on September 28, 1998, January 31, 1999, March 13, 1999, and June 30, 2003. After assessing the subject property, MEMA offered to purchase the house from Green for $63,110.00 as part of a mitigation grant program, but the offer was declined.

On December10, 2007, Green sold the house to Lewis and Turkesa Bullock for the price of $110,000.00. Allstate contends that even though Green was well aware of the flooding issue, considering his previous communication with MEMA and Lamar County, he did not disclose the problem to the Bullocks. In fact, at no point, from the time of initial negotiation to the final closing, were the Bullocks made aware from any source that the house was located in an area prone to flooding.

The Bullocks learned of the flooding problem once they experienced a flood for themselves as occupants of their new house. Making their situation worse, they had failed to purchase flood insurance, alleging that they were unaware that it was needed. Frustrated with discovering that such alleged material information had been concealed from them in a real estate purchase, the Bullocks filed suit in state court.

Their complaint cast a very wide net, containing multiple causes of action against apparently every party involved in facilitating the sale of the house. The underlying allegations of the Complaint are that: (1) Green intentionally perpetuated a fraud against

the Bullocks by failing to disclose the history of flooding surrounding the house; (2) all of the other defendants, including a bank, a flood safe company, a title company, and a real estate firm, either intentionally or negligently failed to discover this fraud; (3) as a result of this undiscovered fraud, the Bullocks suffered pecuniary damages by being stuck with a house that they likely would not have purchased upon full information.

When he sold the house, Green maintained three separate insurance policies with Allstate.  Specifically, he held a Deluxe Plus Homeowners Policy, a Landlord Policy, and a Personal Umbrella Policy.  Upon services of the state court Complaint on Green, Allstate agreed to defend him under a reservation of rights.  Allstate has now filed the present action seeking a declaratory judgment that it has no duty to defend Green in the underlying lawsuit between himself and the Bullocks, and has now filed this Motion for Summary Judgment.

## **STANDARD OF REVIEW**

The Federal Rules of Civil Procedure, Rule 56(c) authorizes summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FRCP 56(c); and *see Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986).  The existence of a material question of fact is itself a question of law that the district court is bound to consider before granting summary judgment.  *John v. State of La. (Bd. of T. for State C. & U.)*, 757 F.2d 698, 712 (5th Cir. 1985).

A Judge's function at the summary judgment stage is not himself to weigh the

evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986).

Although Rule 56 is peculiarly adapted to the disposition of legal questions, it is not limited to that role. *Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis*, 799 F.2d 218, 222 (5th Cir. 1986). "The mere existence of a disputed factual issue, therefore, does not foreclose summary judgment. The dispute must be genuine, and the facts must be material." *Id.* "With regard to 'materiality', only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment." *Phillips Oil Company v. OKC Corporation*, 812 F.2d 265, 272 (5th Cir. 1987). Where "the summary judgment evidence establishes that one of the essential elements of the plaintiff's cause of action does not exist as a matter of law, . . . all other contested issues of fact are rendered immaterial. *See Celotex*, 477 U.S. at 323, 106 S.Ct at 2552." *Topalian v. Ehrman*, 954 F.2d 1125, 1138 (5th Cir. 1992). In making its determinations of fact on a motion for summary judgment, the Court must view the evidence submitted by the parties in a light most favorable to the non-moving party. *McPherson v. Rankin*, 736 F.2d 175, 178 (5th Cir. 1984).

The moving party has the duty to demonstrate the lack of a genuine issue of material fact and the appropriateness of judgment as a matter of law to prevail on his motion. *Union Planters Nat. Leasing v. Woods*, 687 F.2d 117 (5th Cir. 1982). The movant accomplishes this by informing the court of the basis of its motion, and by

identifying portions of the record which highlight the absence of genuine factual issues. *Topalian*, 954 F.2d at 1131.

"Rule 56 contemplates a shifting burden: the nonmovant is under no obligation to respond unless the movant discharges [its] initial burden of demonstrating [entitlement to summary judgment]." *John*, 757 F.2d at 708. "Summary judgment cannot be supported solely on the ground that [plaintiff] failed to respond to defendants' motion for summary judgment," even in light of a Local Rule of the court mandating such for failure to respond to an opposed motion. *Id.* at 709.

However, once a properly supported motion for summary judgment is presented, the nonmoving party must rebut with "significant probative" evidence. *Ferguson v. National Broadcasting Co., Inc.*, 584 F.2d 111, 114 (5th Cir. 1978). In other words, "the nonmoving litigant is required to bring forward 'significant probative evidence' demonstrating the existence of a triable issue of fact." *In Re Municipal Bond Reporting Antitrust Lit.*, 672 F.2d 436, 440 (5th Cir. 1982). To defend against a proper summary judgment motion, one may not rely on mere denial of material facts nor on unsworn allegations in the pleadings or arguments and assertions in briefs or legal memoranda. The nonmoving party's response, by affidavit or otherwise, must set forth specific facts showing that there is a genuine issue for trial. Rule 56(e), Fed.R.Civ.P. *See also, Union Planters Nat. Leasing v. Woods*, 687 F.2d at 119.

While generally "'[t]he burden to discover a genuine issue of fact is not on [the] court,' (*Topalian* 954 F.2d at 1137), 'Rule 56 does not distinguish between documents merely filed and those singled out by counsel for special attention-the court must consider both before granting a summary judgment.'" *John*, 757 F.2d at 712 (quoting

*Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406, 410 (5th Cir. 1980)).

**The Insurer's Duty to Defend**

As a general rule in Mississippi, an insurer has a duty to defend claims that fall under the coverage of an applicable policy. *Sennett v. U.S. Fidelity and Guar. Co.*, 757 So. 2d 206, 212 (Miss. 2000). Courts have used the "allegations of the complaint rule" to determine whether a claim is in fact covered. In doing so, the court must first interpret the policy language itself, then determine whether an allegation in the complaint, if proven true, would fall within that coverage. *Barden Mississippi Gaming LLC d/b/a Fitzgerald's Casino v. Great Northern Ins. Co.*, 576 F.3d 235 (5th Cir. 2009). It is the underlying facts alleged in the complaint, and not the legal conclusions asserted, that are relevant to the insurer's duty. *Nationwide Mut. Ins. Co. V. Lake Caroline, Inc.* 515 F.3d 414, 418 (5th Cir. 2008). It is the tortious conduct itself, not the accompanying legal theories, which triggers the duty to defend. *Id.*, at 421.

An insurer's duty to defend is independent of, and broader than, its duty to indemnify. For example, while an insurer must defend even baseless and fraudulent claims, it has no similar duty to indemnify such claims. However, as broad as the duty to defend may be, an insurer has no duty to defend a claim that does not fall within the policy's definition of coverage. *See Farmland Mut. Ins. Co. v. Scruggs*, 886 So. 2d 714 (Miss. 2004).

**ANALYSIS**

In the present case, Allstate alleges that it does not have a duty to defend Green,

-6-

because the alleged conduct underlying the state court action in question constituted an intentional tort, and therefore was not a covered "occurrence" within the meaning of the policy language. After reviewing the allegations of the State court Complaint and the relevant policy language, the court agrees.

An analysis of the policy contract language is the first order of business. "Where a contract is clear and unambiguous, its meaning and effect are matters of law." *USF&G Co. v. Omnibank*, 812 So.2d 196, 198 (Miss.2002). "The policy itself is the sole manifestation of the parties' intent, and no extrinsic evidence is permitted absent a finding by a court that the language is ambiguous and cannot be understood from a reading of the policy as a whole." *Great Northern Nekoosa Corp. v. Aetna Cas. and Sur. Co.*, 921 F.Supp. 401, 406 (N.D.Miss.1996)(citing *Cherry v. Anthony, Gibbs, Sage*, 501 So.2d 416, 419 (Miss. 1987). "The construction of an insurance contract is limited to an examination of the written terms of the policy itself." *Great Northern Nekoosa Corp.*, 921 F.Supp. at 406 (N.D.Miss.1996)(citing *Employers Mut. Casualty Co. v. Nosser*, 250 Miss. 542, 553, 164 So.2d 426, 430 (1964)).

In interpreting an insurance policy, the courts "should look at the policy as a whole, consider all relevant portions together and, whenever possible, give operative effect to every provision in order to reach a reasonable overall result." *J & W Foods Corp. v. State Farm*, 723 So.2d 550, 552 (Miss. 1998). "The court must construe the policy in a manner that effectuates the parties' intentions." *Great Northern Nekoosa Corp.*, 921 F.Supp. at 406. *See also Western Line Consol. School Dist. v. Continental Cas. Co.*, 632 F.Supp. 295, 302 (N.D.Miss.1986)(citing *Monarch Ins. Co. v. Cook*, 336 So.2d 738, 741 (Miss.1976)).

Green's liability insurance policies contain the following language as to when liability coverage is provided:

**Homeowners Policy Language**

**Insured Property: 4 Cavalier, Hattiesburg, MS 39402-8159**

> **Coverage X: Family Liability and Guest Medical Protection**
>
> **Losses We Cover Under Coverage X:**
> Subject to the terms, conditions and limitations to this policy, Allstate will pay damages which an insured person becomes legally obligated to pay because of bodily injury or property damage arising from an occurrence to which this policy apples and is covered by part of this policy.
>
> **Losses We Do Not Cover Under Coverage X:** We do not cover any bodily injury or property damage intended by or which may be reasonably expected to result from the intentional or criminal acts or omissions of, any insured person.
>
> **"Occurrence"** – means an accident, including continuous or repeated exposure to substantially the same general harmful conditions during the policy period, resulting in bodily injury or property damage.
>
> **"Bodily Injury"** – means physical harm to the body, including sickness or disease, and resulting death.
>
> **"Property Damage"** – means physical injury to or destruction of tangible property, including loss of its use resulting from such physical injury or destruction

**Landlord Policy Language:**

**Insured Property: 201 Clarence Ray Dr., Hattiesburg, MS 39402-1028**

> *Coverage X: Liability Protection*
>
> *Losses We Cover Under Coverage X*:
> ...Allstate will pay compensatory damages which an insured person becomes legally obligated to pay because of bodily injury, personal injury, or property damage arising from a covered occurrence
>
> **Losses We Do Not Cover Under Coverage X:**

We do not cover bodily injury, personal injury, or property damage intended by, or which may be expected to result from the intentional or criminal acts or omissions of, an insured person.

**"Occurrence" – means:**
Under Coverage X – Liability Protection, an accident during the policy period, including continued and repeated exposure to substantially the same general harmful conditions during the policy period, resulting in bodily injury, personal injury or property damage and arising form the ownership, maintenance, or use of said premises.

**"Bodily Injury"** – means physical harm to the body, including sickness, disability or disease, and resulting death.

**"Personal Injury"** – means damages resulting from:
   a) false arrest, false imprisonment, wrongful detention;
   b) wrongful injury, invasion of rights of occupancy, wrongful eviction;
   c) libel, slander, humiliation, defamation of character, invasion of rights to privacy.

**"Property Damage"** – means physical harm to or destruction of tangible property, including loss of its use resulting from such physical harm or destruction. Property damage does not include theft or conversion of property by an insured person.

## PERSONAL UMBRELLA POLICY

**Coverage – When We Pay**
Allstate will pay when an insured becomes legally obligated to pay for personal injury or property damage caused by an occurrence.

**General Exclusions – When This Policy Does Not Apply**
to any intentionally harmful act or omission of an insured

**"Occurrence"** – means an accident or a continuous exposure to conditions. An occurrence includes personal injury and property damage caused by an insured while trying to protect persons or property from injury or damage.

**"Personal Injury"** – means:
   a) bodily injury, sickness, disease or death of any person. Bodily injury includes disability, shock, mental anguish and mental injury;
   b) false arrest; false imprisonment; wrongful detention; wrongful entry; invasion of rights of occupancy; or malicious prosecution;

-9-

>**c)** libel; slander; misrepresentation; humiliation; defamation of character; invasion of rights of privacy; and
>**d)** discrimination and violation of civil rights, where recovery is permitted by law. Fines and penalties imposed by law are not included.

>**"Property Damage"** – means physical injury to tangible property. It includes resulting loss of use. This also means loss of use of tangible property not physically injured if the loss of use is caused by an occurrence during the policy period.

Each policy only provides liability coverage for injury or damage caused by an "occurrence." Each policy then defines an "occurrence," as an accident. The Mississippi Supreme Court has held that an accident is something which "produces unexpected and unintended results" from the standpoint of the insured. *Farmland Mut. Ins. Co. v. Scruggs*, 886 So.2d at 719. Further, "the term accident refers to [the insured's] action and not whatever unintended damages flowed from the act." *ACS Const. Co., Inc. Of Mississippi v. CGU*, 332 F.3d 885, 888 (5th Cir. 2003)(quoting *Allstate Ins. Co. v. Moulton*, 464 So.2d 507, 510 (Miss. 1985)). Additionally, the Mississippi court has clearly held that claims arising from intentional conduct that create foreseeable harm, regardless of the ultimate injury or damage, are not covered under the type of policy language at issue here. See *USF&G Co. v. Omnibank*, 812 So.2d 196, 201 (Miss.2002).

The Mississippi Supreme Court has articulated a test to determine whether an incident falls under the definition of "accident," and is thus an "occurrence." It held that an act is not an "accident," and thus not an "occurrence" if:

>(1) the act is committed consciously and deliberately, without the unexpected intervention of any third force; and

>   (2) the likely (and actual) effect of the act was well within the actor's foresight and anticipation.

*Moulton*, 464 So. 2d at 509.

Therefore, a reviewing court must determine whether a chain of events leading to the damages complained of by a plaintiff was set in motion and followed a course of action committed consciously and deliberately and controlled by the insured without the unexpected intervention of any third party or extrinsic force. *Moulton*, 464 So.2d at 509. Then, the court must also determine whether the likely (and actual) effect [*i.e.*, damage] of those actions were well within the putative insured's "foresight and anticipation." *Id.*

In the present case, Arthur Green's misrepresentation was not without foresight or anticipation. It was not undesigned, sudden, or unexpected. Rather, it was an intentional misrepresentation of the house's flooding problem. Green knew that the house was in an area prone to flooding because he had been put on notice by both Lamar County and by MEMA. Further, he knew that the house's flooding problem affected the economic value of the house, if not out of common sense, then because MEMA offered to purchase the house for about $26,000.00 less than what he paid for it. In Mississippi, under the *Omnibank* analysis, whether Mr. Green intended for the Bullocks to suffer economically from his misrepresentation is irrelevant. Rather, the determinative fact is that he intentionally did not disclose the flooding problem even though he was aware that it was of material importance to the value of the house.

Under the policy language, Allstate has no duty to defend a lawsuit based on the independent tort of intentional representation or fraud. In Mississippi, intentional or fraudulent representation requires the following elements: (1) a representation, (2) its

falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) his consequent and proximate injury.  *See, McCord v. Healthcare Recoveries, Inc.*, 960 So. 2d 399, 406 (Miss. 2007).

In the Bullocks's State court complaint, Mr. Green's tortious conduct which gave rise to the lawsuit is described as follows in excerpts from the Complaint:

> VI.
> Upon information and belief, the plaintiff believes Green purchased the house with knowledge of the flooding with the motive of turning a quick profit.
>
> . . .
>
> X.
> MEMA offered $63,110.00 [to] Arthur B. Green for the house. Motivated by greed, Green rejected the offer by MEMA.
>
> XI.
> With the delusional belief that he was entitled to more and with the intent to conceal the  danger of flood, Green placed his house on the open market. Soon after, Green found his unsuspecting victims.
>
> . . .
>
> XIII.
> From the point of negotiation to the closing, Green committed fraud by concealing the fact that the house was prone to flooding.
>
> . . .
>
> XV.
> This failure by all of these entities to uncover Green's fraud placed the Bullocks in a severe economic disadvantage.

. . .

XVII.

Additionally, had a thorough investigation of the house been done, Green's fraud would have been uncovered.

XVIII.

. . . none of the entities discovered the fraud.

. . .

XXIV.

Despite all of these "gentlemen" involved in the sale of the house, Green's fraud was not brought to the plaintiff's attention.

As previously stated, under the allegations of the complaint rule, the underlying facts of the complaint will determine whether or not Green's conduct falls under the policy coverage. In the Complaint, both the underlying facts and the asserted legal conclusions allege that Arthur Green's conduct constituted intentional, fraudulent misrepresentation. The Bullocks went so far as to attach the record of MEMA's proposed purchase of Mr. Green's house as evidence that he was fully aware of the house's flooding history, and the economic effect that it had on the house. Green's failure to disclose the knowledge he had obtained about the flooding of the house was not accidental under the allegations of the Bullock's State court Complaint.

Further, Green's policies contain specific exclusions which deny coverage for intentional acts. When the language of an insurance contract is clear and unambiguous, it is construed as written, not in favor of the insured. *Progressive Gulf Insurance Co. v. Dickerson and Bowen, Inc.*, 965 So. 2d 1050 (Miss. 2007). Under Mississippi law there is no "occurrence" under policies which define "occurrence" as an "accident" if the harm for which recovery is sought from the insured resulted from an

insured's intentional or deliberate actions, even if the insured did not intend such harm. It is further settled under Mississippi law that an insurer's duty to defend under a general commercial liability policy for injuries caused by accidents does not extend "to injuries unintended by the insured but which resulted from intentional actions of the insured" even if those actions were not intentionally tortious but rather only negligent. If the acts themselves were not accidental, even if they may have been negligent, then there is no "occurrence." *Essex Insurance Company v. Greenville Convalescent Home, Inc.*, 2006 WL 2347522 (N.D. Miss.). While a duty to defend may still arise under this definition of an "occurrence" if an insured acts in a negligent manner, that action must still be accidental and unintended in order to implicate such a duty. *ACS Const. Co., Inc. of Mississippi v. CGU*, 332 F.3d at 890.

      Green's Deluxe Homeowners policy specifically states that "[Allstate does] not cover any bodily injury or property damage intended by or which may reasonably be expected to result from the intentional or criminal acts or omissions of any insured person." Similarly, his Landlords Package policy has a provision which states that "[Allstate does] not cover bodily injury, personal injury, or property damage intended by, or which may reasonably be expected to result from the intentional or criminal acts or omissions of an insured person." Finally, the endorsement to his Personal Umbrella has an amended, general exclusion which states that "this policy does not apply... to any intentionally harmful act or omission of an insured.

      Since Green allegedly knew of the flooding problem, knew that the problem adversely affected the resale value of the house, and knew that it would be a material fact to the Bullocks, his failure to disclose the problem was intentional. The State court

-14-

Complaint alleges that he purposefully decided to withhold a known fact about that house that dramatically affected its sale. Each of his policies contain clear, unambiguous provisions which specifically deny coverage for damages arising from intentional acts or omissions. Therefore, since his intentional misrepresentation is specifically excluded from coverage, Allstate has no duty to defend Green in the resulting State court lawsuit.

In response, Green contends in his opposition brief that his conduct was "[arguably] accidental and unintended" because he relied on the substance of other disclosures and information instead of his own personal knowledge as gained by the above mentioned notices. However, none of these reliance arguments supports a conclusion that Green was somehow negligent, or his conduct was "accidental" as a result of such reliance.

Specifically, Green states that he "relied on disclosures and certifications made to him that the home itself was not located in a special flood zone from the entity responsible for designating property in special flood zones." However, whether the property is located in a "special flood zone" as designated by a "responsible party" is irrelevant. The issue at the center of this coverage dispute is not whether the home was in a "specially designated" flood zone, but instead, whether Green had knowledge, no matter how gained, that the house in question had a history of flooding, at the time he represented to the Bullocks that it did not.

Documentation exists, in the form of the MEMA worksheet and the Lamar County Board of Supervisor's memo, that the house was in an area prone to flooding, and that the house itself had flooded on four separate occasions prior to Green's purchase of it.

Green's interactions with MEMA would have alerted him to both the subjective flood history of the house, and the larger history of flooding in the area. Once he was made aware of the house's flood history, he possessed knowledge of material information, and failing to disclose that information was not accidental. Green allegedly chose which information to reveal, and which to keep to himself, regardless of whether he ever intended the Bullocks to suffer economically as a result of his misrepresentation.

Finally, Green contends, that even if his conduct is not an accident, it still may fall within the definition of an "occurrence" based on the language of the Personal Umbrella Policy. That policy contains an additional definition of an "occurrence" as "a continuous exposure to conditions," and includes "personal injury and property damage caused by an insured while trying to protect persons or property from injury or damage..." However, according to the facts alleged herein, the court cannot conclude that the misrepresentation constitutes an "occurrence" either as an accident, or as a "continuous exposure to conditions" as covered in the Policy.

Green argues that, as alleged in the underlying State court complaint, he "exposed [the Bullocks] to a continuous risk of flooding." However, Green fails to realize that this so called exposure was only based on a single incident of alleged fraud. There is a fundamental difference between "exposure to a continuous condition" as argued in Green's brief, and "continuous exposure to a condition" as covered in the Policy. There was nothing "continuous" in Green's actions. His alleged tortious conduct consisted of a single misrepresentation of the flooding history surrounding the house. Regardless, Green's conduct would be excluded as intentional even if it were to somehow fall under this strained definition of an "occurrence."

-16-

## **CONCLUSION**

The court finds that allegations of the Bullock's State court Complaint assert that Green had personal knowledge of the house's flood history and of its location within an area known to flood, and these allegations appear credible. Thus, Green's misrepresentation of these material facts to the Bullocks was not an accident. This is true even if he was originally subjected to the same misinformation to which he subjected the Bullocks. As such, whether his misrepresentation was intentional, or merely non-accidental, it was not covered by the policies under which he seeks a defense. For these reasons, the court concludes that Allstate does not have a duty to defend the conduct of Green, nor does it owe indemnity for the resulting contract-based damages recovered, if any, in the underlying State court suit.

IT IS THEREFORE ORDERED AND ADJUDGED that Motion for Summary Judgment **[#11]** filed on behalf of the plaintiff Allstate Insurance Company is granted, that this matter is dismissed with prejudice and that any other pending motions are denied as moot. A separate judgment shall be entered herein in accordance with Rule 58, Federal Rules of Civil Procedure.

SO ORDERED AND ADJUDGED this 22nd day of November, 2010.

> *s/Keith Starrett*
> UNITED STATES DISTRICT JUDGE